McCULLOUGH, Judge.
 

 *428
 
 Henry Datwane Hunt ("defendant") appeals from judgments entered upon his convictions of possession with intent to sell or deliver marijuana and trafficking by possession of 4 or more grams but less than 14 grams of opium. Defendant argues that the trial court erred by failing to give a requested jury instruction on a lesser-included offense and in
 
 *429
 
 admitting certain testimony from the State's expert witness. After careful review, we hold no error.
 

 I.
 
 Background
 

 On 14 July 2014, defendant was indicted for possession with intent to sell or deliver marijuana in violation of
 
 N.C. Gen. Stat. § 90-95
 
 (a)(2), possession of drug paraphernalia in violation of
 
 N.C. Gen. Stat. § 90-113.22
 
 (a), and trafficking by possession of more than 4 but less than 14 grams of opium in violation of
 
 N.C. Gen. Stat. § 90-95
 
 (h)(4)(a). Defendant's case came on for trial at the 27 July 2015 criminal session of Henderson County Superior Court, the Honorable Todd Pomeroy presiding.
 

 The State's evidence at trial tended to show the following: On 2 March 2013, officers from the Henderson County Sheriff's Department responded to a call about a suspicious vehicle located in the parking lot of Mountain Inn and Suites ("the hotel"). Detective Steve Pederson ("Detective Pederson") testified that based on information obtained from a telephone conversation with a clerk at the hotel, he decided to conduct a "knock-and-talk" investigation of hotel rooms 200 and 206. Upon entering the hotel, officers noticed a strong odor of raw marijuana in the lobby. Detective Pederson proceeded to the second floor of the hotel where Corporal Josh Harden ("Corporal Harden") and Deputy Scott Lindsay were already located.
 

 Corporal Harden testified that he had seen defendant walking down the hallway of the second floor. Corporal Harden asked defendant what room he was staying in and defendant said room 206. Corporal Harden asked if "there was somewhere we could go to talk" when defendant opened the door to room 206 and invited the officers inside. Corporal Harden testified that the room smelled of marijuana. During the course of his subsequent conversation with Corporal Harden, defendant admitted to smoking "four blunts" and gave consent to search his room. Defendant stated that he had also rented room 200. Defendant then requested to use the restroom. Corporal Harden told defendant that he would be have to be searched first and defendant consented to a search of his person. After the search revealed a lump in defendant's right front pocket, defendant produced a clear plastic bag containing pills. Defendant stated that the pills were "Percs," what Corporal Harden understood to be "Percocet," and that he was holding them for a friend. Defendant consented to searches of both hotel rooms and the searches revealed marijuana, cash, and various drug paraphernalia.
 

 *430
 
 The State tendered, without objection from defendant, Miguel Cruz-Quinones ("Agent Cruz-Quinones"), a special agent and forensic chemist with the North Carolina State Crime Laboratory, as an expert in forensic
 
 *877
 
 drug chemistry. Agent Cruz-Quinones testified that after visual inspection, he determined that the pills found in defendant's possession were pharmaceutically manufactured pills containing oxycodone. Agent Cruz-Quinones testified that the North Carolina State Crime Laboratory procedures are governed by a document called the "administrative procedure for sampling" ("APS"). Pursuant to the APS, Agent Cruz-Quinones elected to use a testing procedure called the "administrative sample selection" that is applied to pharmaceutically manufactured pills. This method of analysis involves visually inspecting the shape, color, texture, and manufacturer's markings or imprints of all units and comparing them to an online database called "Micromedex
 
 [1]
 
 " to determine whether the pills are pharmaceutically prepared. After the chemist has determined that the units are similar, and not counterfeit, the administrative sample selection method requires the chemist to weigh the samples and "randomly select one and chemically analyze the one tablet" using gas chromatography and a mass spectrometer.
 

 Here, Agent Miguel Cruz-Quinones testified that upon receiving the pills found to be in defendant's possession, he divided them into four separate categories based on the physical characteristics of the pills. He labeled these categories 1A, 1B, 1C, and 1D. Using administrative sample selection, Agent Miguel Cruz-Quinones tested one pill from groups 1A, 1B, and 1C. Each chemically analyzed pill tested positive for oxycodone, a Schedule II controlled substance. Agent Cruz-Quinones testified that the combined weight of the pills seized from defendant exceeded four grams: twenty-four pills in 1A weighed 2.97 grams; nine pills in 1B weighed 0.88 grams; and three pills in 1C weighed 0.30 grams. Agent Cruz-Quinones did not test 1D, which consisted of only 1 pill, because the statutory threshold for trafficking had already been met. Agent Cruz-Quinones' laboratory report provided that as to the non-tested tablets in each group, they "were visually examined, however no chemical analysis was performed. ... The physical characteristics, including shape, color and manufacturer's markings of all units were visually examined and found to be consistent with a pharmaceutical preparation containing Oxycodone-Schedule II Opium Derivative. There were no visual indications of tampering." The results of this particular drug analysis
 
 *431
 
 were subjected to peer review by a senior level analyst at the North Carolina State Crime Laboratory.
 

 On 24 July 2015, defendant filed a motion in limine and argued that the State's experts should be prohibited from "expressing any opinion as to the identity of any and all items submitted to the State Crime Lab which were not actually subjected to forensic chemical testing." Defendant contended that the State Crime Lab's protocols provided that in the use of administrative sample selection, "No inferences about unanalyzed materials are made."
 

 The trial court denied defendant's motion, concluding that the "reasoning and methodology underlying [Agent Cruz-Quinones'] testimony regarding the weight, composition, and his use of Administrative Sampling Method" were scientifically valid, could be applied to the facts in issue, and complied with Rule 702 of the North Carolina Rules of Evidence.
 

 On 30 July 2015, a jury found defendant guilty on all charges. Defendant was sentenced as a prior record level I to concurrent sentences of 70 to 93 months imprisonment for trafficking opium and 5 to 15 months for possession with intent to sell or deliver marijuana. Defendant appeals.
 

 II.
 
 Discussion
 

 Defendant presents two issues on appeal. He argues that (A) the jury should have received an instruction on the lesser-included offense of possession of a controlled substance and that (B) the trial court erred in admitting certain testimony of the State's expert witness. We address each argument in turn.
 

 *878
 
 A.
 
 Lesser-Included Offense Jury Instruction
 

 Defendant contends that the trial court committed error by failing to instruct the jury on the lesser-included charge of possession of a controlled substance. This contention is without merit.
 

 Defendant's arguments challenging the trial court's decisions regarding jury instructions are reviewed
 
 de novo
 
 by this Court.
 
 State v. Osorio
 
 ,
 
 196 N.C.App. 458
 
 , 466,
 
 675 S.E.2d 144
 
 , 149 (2009). Even in the absence of a special request, judges are required to charge upon lesser-included offenses if the evidence supports such a charge.
 
 State v. Peacock
 
 ,
 
 313 N.C. 554
 
 , 558,
 
 330 S.E.2d 190
 
 , 193 (1985). "The sole factor determining the judge's obligation to give such an instruction is the presence, or absence, of any evidence in the record which might convince a
 
 *432
 
 rational trier of fact to convict the defendant of a less grievous offense."
 
 State v. Wright
 
 ,
 
 304 N.C. 349
 
 , 351,
 
 283 S.E.2d 502
 
 , 503 (1981). "[W]hen the State's evidence is clear and positive with respect to each element of the offense charged and there is no evidence showing the commission of a lesser included offense, it is not error for the trial judge to refuse to instruct on the lesser offense."
 
 State v. Hardy
 
 ,
 
 299 N.C. 445
 
 , 456,
 
 263 S.E.2d 711
 
 , 718-19 (1980).
 

 The crime of trafficking in opium,
 
 N.C. Gen. Stat. § 90-95
 
 (h)(4), contains two essential elements. Defendant must engage in the: "(1) knowing possession (either actual or constructive) of (2) a specified amount of [opium]."
 
 State v. Keys,
 

 87 N.C.App. 349
 
 , 352,
 
 361 S.E.2d 286
 
 , 288 (1987).
 
 N.C. Gen. Stat. § 90-95
 
 (h)(4) also applies to trafficking in pharmaceutical preparations containing opium derivatives.
 
 State v. Ellison
 
 ,
 
 366 N.C. 439
 
 , 444,
 
 738 S.E.2d 161
 
 , 164 (2013). Simple possession of opium is a lesser-included offense of trafficking in opium.
 
 See
 

 State v. McCracken
 
 ,
 
 157 N.C.App. 524
 
 , 528,
 
 579 S.E.2d 492
 
 , 495 (2003).
 

 Specifically, defendant challenges Agent Cruz-Quinones' testimony that the tablets delivered to the State Crime Lab collectively contained over 4 grams of opium. The APS, which governs State Crime Lab protocol, notes in its definition of the administrative sample selection that "No inferences about unanalyzed material are made." At trial, Agent Cruz-Quinones testified that this language applies to non-pharmaceutical tablets and not to pharmaceutically prepared tablets. Defendant argues that Agent Cruz-Quinones' interpretation of the APS was incorrect and that because he only performed a chemical analysis of three pills, which weighed less than the statutory threshold for the trafficking charge, the jury should have received the instruction on the lesser-included offense of possession.
 

 Defendant relies on
 
 State v. Riera
 
 ,
 
 276 N.C. 361
 
 ,
 
 172 S.E.2d 535
 
 (1970), for his arguments. In
 
 Riera
 
 , the defendant was convicted of violating a statute that made the possession of 100 or more "tablets, capsules or other dosage forms containing either barbiturate or stimulant drugs, or a combination of both"
 
 prima facie
 
 evidence that such possession was for the purpose of "sale, barter, exchange, dispensing, supplying, giving away, or furnishing."
 
 Id.
 
 at 365,
 
 172 S.E.2d at 538
 
 . The North Carolina Supreme Court held that because there was ample evidence which would allow a jury to find that the defendant committed the lesser-included offense of the misdemeanor, possession of barbiturate drugs, the trial court erred by failing to submit to and instruct the jury on the lesser-included offense.
 
 Id.
 
 at 370,
 
 172 S.E.2d at 541
 
 . However, the
 
 *433
 
 circumstances found in
 
 Riera
 
 are distinguishable from the case before us. In
 
 Riera
 
 , there was conflicting evidence presented as to whether the defendant possessed the capsules for the purpose of sale, thereby providing conflicting evidence as to whether the defendant had violated the applicable statute. The defendant's evidence tended to demonstrate that he had found the capsules behind a building three to four weeks before the search of his home and that he had no intention to use or sell them, did not know what the capsules were, and had intended to throw them out.
 
 Id.
 
 at 364,
 
 172 S.E.2d at 537
 
 . Also in
 
 Riera
 
 , the State's expert witness testified that out of 205 capsules that were found at the defendant's home, "he did not test all 205 capsules and that he did not know exactly how many he
 
 *879
 
 did test[,]" but that he "usually tested three or four and looked at the others to see if they all had the same physical appearance."
 
 Id
 
 . Here, Agent Cruz-Quinones thoroughly documented his analysis and followed protocol, grouping the pharmaceutically manufactured tablets seized from defendant into four categories based on the unique physical characteristics of the pills. He then chemically analyzed one pill from three categories and determined that they tested positive for oxycodone. Agent Cruz-Quinones was able to testify extensively as to the exact procedures he performed instead of making a conjecture as to his analysis as the State's expert did in
 
 Riera
 
 .
 

 The following cases are helpful in our analysis: In
 
 State v. Wilhelm
 
 ,
 
 59 N.C.App. 298
 
 ,
 
 296 S.E.2d 664
 
 (1982), the defendant was convicted of trafficking methaqualone. On appeal, the defendant argued that since only three tablets were chemically analyzed, the State had failed to prove that he possessed more than 5,000 methaqualone tablets.
 
 Id.
 
 at 303,
 
 296 S.E.2d at 667
 
 . Our Court rejected the defendant's argument and held that "[w]hen a random sample from a quantity of tablets or capsules identical in appearance is analyzed and is found to contain contraband, the entire quantity may be introduced as the contraband."
 
 Id
 
 . Our Supreme Court held in
 
 State v. Ward
 
 ,
 
 364 N.C. 133
 
 ,
 
 694 S.E.2d 738
 
 (2010), that, in trafficking cases' "[a] chemical analysis of each individual tablet is not necessary" and that while "[a] chemical analysis is required in this context, [ ] its scope may be dictated by whatever sample is sufficient to make a reliable determination of the chemical composition of the batch of evidence under consideration."
 
 Id
 
 . at 148,
 
 694 S.E.2d at 747
 
 .
 

 Recently, in
 
 State v. Lewis
 
 , --- N.C. App. ----,
 
 779 S.E.2d 147
 
 (2015),
 
 disc. rev. denied,
 

 368 N.C. 688
 
 ,
 
 781 S.E.2d 480
 
 (2016), the defendant was convicted of conspiracy to traffic 14 grams or more but less than 28 grams of opiates.
 

 Id.
 

 at ----,
 
 779 S.E.2d at 148
 
 . The police seized twenty pills from the defendant, weighing 17.63 grams total. The State's expert
 
 *434
 
 chemically analyzed one pill and testified that it contained oxycodone with a net weight of 0.88 grams.
 

 Id.
 

 The remaining pills, with a net weight of 16.75 grams, were visually examined and found to have "the same similar size, shape and form as well as the same imprint on each of them."
 

 Id.
 

 On appeal, the defendant contended that the jury was entitled to instructions on all lesser-included offenses because the evidence did not clearly establish the amount of opium derivative present in the pills.
 

 Id.
 

 As in the present case, the defendant in
 
 Lewis
 
 "[did] not challenge the evidence supporting the fact that he was trafficking in opium derivative; rather, [he challenged] the sufficiency of the expert's analysis as to precisely how much opium derivative was present."
 

 Id.
 

 at ----,
 
 779 S.E.2d at 148-49
 
 . Our Court, citing to precedent established in
 
 Wilhelm
 
 and
 
 Ward
 
 , concluded that it was not necessary to test every tablet. Instead, it held that "upon establishing the chemical composition of a sufficient sample, and visually confirming that the remaining pills were similar, the State's analyst satisfied the evidentiary burden upon the State to determine the quantity of opium derivative in the pills."
 

 Id.
 

 at ----,
 
 779 S.E.2d at 149
 
 . Accordingly, our Court held that the trial court did not err by declining to instruct the jury on lesser-included offenses because the evidence was sufficient to support the charge of conspiracy to traffic 14 grams or more but less than 28 grams of opiates.
 

 Id.
 

 Based on the reasoning stated in
 
 Wilhelm
 
 ,
 
 Ward
 
 , and
 
 Lewis
 
 , it was not necessary for Agent Cruz-Quinones to chemically analyze each individual tablet. Here, Agent Cruz-Quinones visually inspected all the pills and after comparing them to an online database, determined that they were pharmaceutically manufactured pills containing oxycodone. He then divided the pills into four separate categories based on the physical characteristics of the pills, which included the shape, color, texture, and manufacturer's markings or imprints. Agent Cruz-Quinones then selected one pill from three of the categories and chemically analyzed the pill. Each pill tested positive for oxycodone. As to the remaining pills that were not chemically analyzed, Agent Cruz-Quinones reported that they were visually examined and found to be consistent with pharmaceutically prepared oxycodone. He testified that the combined
 
 *880
 
 weight of the pills seized from defendant exceeded four grams. Agent Cruz-Quinones' sample was "sufficient to make a reliable determination of the chemical composition of the batch of evidence under consideration."
 
 Lewis
 
 , --- N.C. App. at ----,
 
 779 S.E.2d at 149
 
 . Because he confirmed that he visually analyzed the remaining pills and determined that they were similar to the chemically analyzed pills, Agent Cruz-Quinones satisfied the State's evidentiary burden of establishing the quantity of opium in the pills.
 
 See
 

 *435
 

 State v. Dobbs
 
 ,
 
 208 N.C.App. 272
 
 , 276,
 
 702 S.E.2d 349
 
 , 352 (2010) ("a chemical analysis test of a portion of the pills, coupled with a visual inspection of the remaining pills for consistency, was sufficient to support a conviction for trafficking in 10,000 or more tablets of methaqualone."). Accordingly, the State's evidence was clear and positive with respect to each element of trafficking in opium.
 

 Defendant contends that the introduction of the APS into evidence and Agent Cruz-Quinones' deviation from the protocol distinguishes his case from
 
 Lewis
 
 and its antecedents. Our Court addressed a comparable issue in an unpublished opinion,
 
 State v. Hudson
 
 ,
 
 218 N.C.App. 457
 
 ,
 
 721 S.E.2d 763
 
 , 2012 N.C. App. LEXIS 153,
 
 2012 WL 379936
 
 (Feb. 2012) (unpub.). Although this case does not constitute controlling legal authority, we find its reasoning persuasive. In
 
 Hudson,
 
 the defendant argued that testimony from the State's fingerprint expert, Amanda Wiltzus, should have been excluded because she failed to adhere to the Analysis, Comparison, Evaluation, and Verification ("ACE-V") methodology, which she purported to apply in her analysis.
 

 Id.
 

 , 2012 N.C. App. LEXIS 153, at *5,
 
 2012 WL 379936
 
 , at *2. The defendant argued that the ACE-V protocol required independent verification for fingerprint analysis and that because verification in his case was performed by Wiltzus' supervisor, the supervisor could not have conducted an independent examination of Wiltzus' work.
 

 Id.
 

 , 2012 N.C. App. LEXIS 153, at *5-6,
 
 2012 WL 379936
 
 , at *2. This Court held that "[o]nce the trial court determines the expert meets the minimum qualifications to qualify as such, deviations from guidelines go to the weight of the expert's testimony, not admissibility."
 

 Id.
 

 , 2012 N.C. App. LEXIS 153, at *9,
 
 2012 WL 379936
 
 , at *3. In accordance with this reasoning, we also hold that any deviation that Agent Cruz-Quinones might have taken from the established methodology went to the weight of his testimony and not the admissibility of the testimony.
 

 In addition, several circuit courts have held that, under
 
 Daubert v. Merrell Dow Pharmaceuticals, Inc.,
 

 509 U.S. 579
 
 ,
 
 113 S.Ct. 2786
 
 ,
 
 125 L.Ed.2d 469
 
 (1993), the introduction of laboratory protocols goes to the weight and not the admissibility of evidence.
 
 See e.g.
 

 United States v. Shea,
 

 211 F.3d 658
 
 , 668 (1st Cir. 2000) (holding that flaws in an application of an otherwise reliable methodology go to weight and credibility, not admissibility);
 
 United States v. Chischilly,
 

 30 F.3d 1144
 
 , 1154 (9th Cir. 1994) ("The impact of imperfectly conducted laboratory procedures might therefore be approached more properly as an issue going not to the admissibility, but to the weight of the DNA profiling evidence.");
 
 United States v. Bonds,
 

 12 F.3d 540
 
 , 563 (6th Cir. 1993) ("[C]riticisms about the specific application of the procedure used or questions about the accuracy of the test results do not render the scientific theory and methodology invalid
 
 *436
 
 or destroy their general acceptance. These questions go to the weight of the evidence, not the admissibility.").
 

 Based on the foregoing, we hold that defendant's challenges to the State's expert testimony did not amount to a conflict in the evidence. The State's evidence was clear and positive as to every element of the trafficking charge and the trial court did not err in failing to instruct the jury on the lesser-included offense of possession of a controlled substance.
 

 B.
 
 State Expert Testimony Under Rule 702(a)
 

 In the alternative, defendant argues that the trial court erred by admitting Agent Cruz-Quinones' testimony which required inferences that were expressly prohibited under the APS. As a result, defendant contends that Agent Cruz-Quinones' testimony contravened Rule 702(a) of the North Carolina Rules of Evidence, which governs the testimony of expert witnesses.
 

 *881
 
 Our Supreme Court has recently confirmed that the General Assembly's amendment to Rule 702 adopted the federal standard for the admission of expert witness testimony articulated in
 
 Daubert
 
 .
 
 State v. McGrady
 
 ,
 
 368 N.C. 880
 
 , 884,
 
 787 S.E.2d 1
 
 (2016). We review a trial court's ruling on admissibility of expert testimony pursuant to Rule 702(a) for an abuse of discretion.
 
 Id.
 
 at 886,
 
 787 S.E.2d at 7
 
 .
 

 Rule 702(a) of the North Carolina Rules of Evidence provides as follows:
 

 (a) If scientific, technical or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue, a witness qualified as an expert by knowledge, skill, experience, training, or education, may testify thereto in the form of an opinion, or otherwise, if all of the following apply:
 

 (1) The testimony is based upon sufficient facts or data.
 

 (2) The testimony is the product of reliable principles and methods.
 

 (3) The witness has applied the principles and methods reliably to the facts of the case.
 

 N.C. Gen. Stat. § 8C-1, Rule 702(a) (2015). "These three prongs together constitute the reliability inquiry discussed in
 
 Daubert
 
 ,
 
 Joiner
 
 , and
 
 *437
 

 Kumho
 
 . The primary focus of the inquiry is on the reliability of the witness's principles and methodology, not on the conclusions that they generate."
 
 McGrady
 
 , 368 N.C. at 890,
 
 787 S.E.2d at 9
 
 (internal citations and quotation marks omitted). "The precise nature of the reliability inquiry will vary from case to case depending on the nature of the proposed testimony. In each case, the trial court has discretion in determining how to address the three prongs of the reliability test."
 

 Id.
 

 In the context of scientific testimony,
 
 Daubert
 
 articulated five factors from a nonexhaustive list that can have a bearing on reliability: (1) "whether a theory or technique ... can be (and has been) tested"; (2) "whether the theory or technique has been subjected to peer review and publication"; (3) the theory or technique's "known or potential rate of error"; (4) "the existence and maintenance of standards controlling the technique's operation"; and (5) whether the theory or technique has achieved "general acceptance" in its field.
 
 Daubert
 
 ,
 
 509 U.S. at 593-94
 
 [
 
 113 S.Ct. 2786
 
 ]. When a trial court considers testimony based on "technical or other specialized knowledge," N.C. R. Evid. 702(a), it should likewise focus on the reliability of that testimony,
 
 Kumho [Tire Co., Ltd. v. Carmichael ]
 
 , 526 U.S. [137] at 147-49 [
 
 119 S.Ct. 1167
 
 ,
 
 143 L.Ed.2d 238
 
 (1999) ]. The trial court should consider the factors articulated in
 
 Daubert
 
 when "they are reasonable measures of the reliability of expert testimony."
 
 Id
 
 . at 152 [
 
 119 S.Ct. 1167
 
 ]. Those factors are part of a "flexible" inquiry,
 
 Daubert
 
 ,
 
 509 U.S. at 594
 
 [
 
 113 S.Ct. 2786
 
 ], so they do not form "a definitive checklist or test,"
 
 id
 
 . at 593 [
 
 113 S.Ct. 2786
 
 ]. And the trial court is free to consider other factors that may help assess reliability given "the nature of the issue, the expert's particular expertise, and the subject of his testimony."
 
 Kumho
 
 , 526 U.S. at 150,
 
 119 S.Ct. 1167
 
 .
 

 Id.
 
 at 890-91,
 
 787 S.E.2d at 9-10
 
 .
 

 In the present case, Agent Cruz-Quinones testified that he analyzed the pills seized from defendant in accordance with procedures set forth in the APS which were employed by the State Crime Lab at the time he completed his testing and which he was required to follow in drug testing. Agent Cruz-Quinones visually inspected the shape, color, texture, and manufacturer's markings or imprints on all the pills and compared them to an online database to determine whether the pills were pharmaceutically manufactured. Once he made the determination that the pills were pharmaceutically prepared, Agent Cruz-Quinones was required to
 
 *438
 
 use a testing procedure called the administrative sample selection, pursuant to the guidelines of the APS.
 

 Agent Cruz-Quinones testified that he divided the pills into four separate categories and grouped the pills together based on similar physical characteristics. The groups were labeled 1A, 1B, 1C, and 1D. The administrative sample selection required Agent Cruz-Quinones to indiscriminately select one pill
 
 *882
 
 from each group and chemically analyze that one pill. When questioned what he did with each pill, Agent Cruz-Quinones testified:
 

 A. What I did with that pill was I took a small sample of it, a small piece of it and submitted to analysis using the gas chromatography and mass spectrometer. That piece was dissolved in a, I believe it was choleriform, yes, choleriform sol[v]ent in a sterile glass vial. After it was dissolved it was sealed with an aluminum cap and labeled with the item number, laboratory number, my initials and date. And it was analyzed in the gas chromatography and mass spectrometer.
 

 The chemically analyzed pills tested positive for oxycodone. Agent Cruz-Quinones testified that the combined weight of all the pills exceeded four grams: twenty-four pills in 1A weighed 2.97 grams; nine pills in 1B weighed 0.88 grams; and three pills in 1C weighed 0.30 grams. 1D was not tested because the statutory threshold for trafficking had already been met. The pills that he did not chemically analyze were nevertheless inspected "using the physical characteristics ... [such as] the color, the texture, the shape and the imprints[.]" These tablets were also examined for evidence of being counterfeit, compared to an online database of pharmaceutical preparations, and found to be consistent with a pharmaceutical preparation containing oxycodone.
 

 Based on Agent Cruz-Quinones' detailed explanation of the procedure he employed to identify the pills seized from defendant, a procedure adopted by the State Crime Lab to analyze and identify pharmaceutically manufactured pills, we hold that his testimony was the "product of reliable principles and methods[,]" sufficient to satisfy the second prong of Rule 702(a).
 

 However, the crux of defendant's argument is that Agent Cruz-Quinones should not have been permitted to testify regarding the pills that were not chemically analyzed and, therefore, Agent Cruz-Quinones' testimony was not "based upon sufficient facts or data" and Agent
 
 *439
 
 Cruz-Quinones did not apply "the principles and methods reliably to the facts of the case[,]" failing to satisfy the first and third prongs of Rule 702(a). We disagree.
 

 At trial, Agent Cruz-Quinones was cross-examined as follows:
 

 Q. The other pills you did a visual inspection of but no actual testing; correct?
 

 A. Correct. Visual inspection.
 

 Q. But you're sitting here today offering an opinion as to the whole amount; correct?
 

 A. Correct.
 

 Q. And that's in spite of your rules and regulations that say specifically under administrative sampling selection that no inferences about unanalyzed materials are made. You are saying that in spite of your rules; correct?
 

 A. That's incorrect. The administrative sample selection has two parts. One, that it is specific to pharmaceutically prepared tablets. And the other one that would apply to more commonly controlled substances that are not pharmaceutically prepared. That statement about not making inference about unanalyzed material refers to that second part, for more commonly controlled substances. It does not refer to pharmaceutically prepared tablets. Pharmaceutically prepared tablets are visually inspected. So they have been visually inspected. That constitutes a preliminary part of the analysis. So that statement about not making inferences about unanalyzed material only applies to other type[s] of controlled substances, more commonly controlled substances, not pharmaceutically prepared tablets.
 

 Agent Cruz-Quinones testified that the pills that were not chemically analyzed were nevertheless carefully visually inspected and compared to an online pharmaceutical database. These pills had similar characteristics, including the shape, color, texture, and manufacturer's markings, as the other pills which were consistent with a pharmaceutical preparation containing oxycodone, a Schedule II opium derivative. Agent Cruz-Quinones also reported "[t]here were no visual indications of tampering."
 

 *440
 
 As such, we hold that Agent Cruz-Quinones' testimony was based upon sufficient
 
 *883
 
 facts and data and that he applied the principles and methods reliably to the facts of the case, satisfying the first and third prong of the reliability analysis under Rule 702(a). Accordingly, the trial court did not abuse its discretion in admitting this testimony.
 

 III.
 
 Conclusion
 

 For the reasons discussed above, we hold that defendant received a fair trial, free from error.
 

 NO ERROR.
 

 Judges STEPHENS and ZACHARY concur.
 

 [1]
 

 The transcript of Agent Cruz-Quinones' testimony reflects the spelling, "Micromatics." However, we believe the correct spelling to be "Micromedex" as noted in footnote 1 of
 
 State v. Ward
 
 ,
 
 364 N.C. 133
 
 , 136,
 
 694 S.E.2d 738
 
 , 740 n.1 (2010).