ARROWOOD, Judge.
 

 *421
 
 Charles Shore ("defendant") appeals from judgments entered upon his convictions for statutory sexual offense of a person thirteen, fourteen, or fifteen years old, and for statutory rape of a person thirteen, fourteen, or fifteen years old. Based on the reasons stated herein, we dismiss in part and find no error in part.
 

 I.
 
 Background
 

 On 31 March 2014, defendant was indicted on the following charges: four counts of indecent liberties with a child in violation of
 
 N.C. Gen. Stat. § 14-202.1
 
 ; one count of statutory sexual offense of a person thirteen, fourteen, or fifteen years old in violation of
 
 N.C. Gen. Stat. § 14-27
 
 .7A(a) ; and three counts of statutory rape of a person thirteen, fourteen, or fifteen years old in violation of
 
 N.C. Gen. Stat. § 14
 
 -27A.
 

 Defendant was tried at the 18 April 2016 criminal session of Mecklenburg County Superior Court, the Honorable Stanley Allen presiding.
 

 *608
 
 The State's evidence tended to show that in 2012, H.M.
 
 [1]
 
 began living with her father. She was eleven years old at the time. H.M.'s father was living with Brandi Coleman ("Brandi") and defendant, who was Brandi's boyfriend. H.M. testified that after moving into the house, she spent time with defendant by jumping on the trampoline, watching sports, fishing, watching television, and playing video games. She described
 
 *422
 
 their relationship as "always friendly, really nice. Anything I ever needed when my dad wasn't around or Brandi wasn't around, he always helped me." In the summer of 2013, defendant's son moved into the house. H.M. shared a room with defendant's son and they became best friends.
 

 In January 2014, after Brandi and defendant ended their relationship, defendant and defendant's son moved to a nearby apartment complex. H.M. testified that she saw defendant and defendant's son "all the time" after they moved, frequently visiting their apartment to "hang out." H.M. spent the night at their apartment more than once and slept in defendant's bed.
 

 H.M. testified that one night, she was sleeping in defendant's bed when defendant got into his pajamas and crawled into bed with her. They "cuddled up together." H.M. testified that defendant's hands "slowly started to go down my side," defendant put his hands around the waistband of her pants, and then her shorts came off. Defendant's hands "entered" her underwear and defendant began touching H.M.'s vagina. Defendant got on top of H.M. and kissed her neck. H.M. told defendant that she was tired and defendant replied, "okay," gave her a hug, and the two fell asleep.
 

 H.M. testified that she and defendant had vaginal intercourse on two occasions. One incident occurred when she spent a few nights at defendant's apartment during the weekend of 14 February 2014. On one of those nights, defendant and H.M. began kissing on the couch. They went into defendant's bedroom where defendant "crawled" on top of her, put his hand inside of her, and then put his penis inside of her. The next morning, defendant gave her a pill which he instructed her to take. The other occasion where defendant had sex with H.M. occurred in the same way except that defendant did not give her a pill to take.
 

 H.M.'s father testified that he would check H.M.'s cell phone on a regular basis. On 22 February 2014, H.M.'s father was looking through H.M.'s cell phone when he noticed text messages from defendant. The messages included "Good morning, Baby[,] "Good morning, Beautiful[,]" and "Hello, Princess." H.M.'s father became very angry and threw the cell phone on the ground and the screen broke. H.M.'s father confronted H.M., asking if "anything ever happened between you and [defendant]" and H.M. replied, "yes." H.M.'s father proceeded to drive to defendant's apartment.
 

 While H.M.'s father was gone, Brandi spoke with H.M. During the conversation, H.M. revealed that defendant had touched her in "her private areas" and that she and defendant engaged in sex.
 

 *423
 
 Defendant was not at his apartment when H.M.'s father arrived. H.M.'s father called Brandi and she was able to convince him to return back to his house. At his house, H.M.'s father directly asked H.M. if she and defendant had ever had sex and H.M. replied, "yes, Dad[.]" H.M.'s father left his house again and went to defendant's apartment. Defendant was not home, so H.M. went to a nearby karate studio in search of defendant. As H.M.'s father walked up to the karate studio, defendant was walking out. H.M.'s father yelled, "you son of a b****, I'm here to kill you[.]" Defendant ran back inside the studio and came back outside with twenty men to protect him. H.M.'s father continued to scream at defendant, claiming that defendant had raped his daughter.
 

 H.M.'s father had called the police earlier and the police arrived on the scene. Officer Thomas Gordon and Sergeant Grant Nelson, of the Matthews Police Department, testified that on 22 February 2014, they responded to
 
 *609
 
 a call at Scott Shields Martial Arts Academy. H.M.'s father informed the officers why he was angry and accused defendant of inappropriately touching H.M. Sergeant Nelson testified defendant "knew what we were there [in] reference to." After Sergeant Nelson explained to defendant that he was not under arrest, defendant told him of two different incidents that occurred with H.M. Defendant stated that one time, H.M. had sat on defendant's lap, grinding her bottom pelvic area into his pelvic area and grabbing his crotch area. Defendant told her to stop, but she continued. On another occasion, defendant was standing when H.M. approached him from behind and grabbed his crotch. Defendant again told her to stop, but she continued to grab him. H.M. then took defendant's hand and placed it down her pants. Defendant left his hand there for a minute and then pulled it out of her pants.
 

 Kelli Wood ("Wood") testified as an expert in clinical social work, specializing in child sexual abuse cases. Wood testified that on 5 March 2014, she interviewed H.M. at Pat's Place Child Advocacy Center, a center providing services to children and their families when there are concerns that a child may be a victim of maltreatment or may have witnessed violence. A videotape of her interview was played for the jury with a limiting instruction that it should be received for corroborative purposes.
 

 At the close of the State's evidence, the State dismissed one count of indecent liberties and one count of statutory rape.
 

 Defendant testified that his relationship with H.M. was "[p]retty good" and they were like family. Defendant denied ever sitting on his couch and kissing H.M. and denied ever sleeping in his bed with H.M.
 

 *424
 
 He also denied ever touching her sexually with his hands, using his mouth to touch her private parts, or having sexual intercourse with her. Defendant admitted that H.M. spent the night at his apartment on 14 and 15 February 2014, but testified that H.M. slept on the lower bunk bed one of the nights and slept on the couch the other night. He testified that on 15 February 2014, his girlfriend, Bridget Davenport, had spent the night with defendant in his bedroom. Defendant testified that on 16 February 2014, he was making lunch in the kitchen when H.M. walked up to him and grabbed his crotch. He backed away and told her "no, no. Inappropriate." H.M. giggled in response. Defendant further testified that on the same day, he was sitting in a recliner when H.M. sat on top of him. Defendant pushed H.M. off of him and told her that "it was very inappropriate, she couldn't do it, could not do that."
 

 On 26 April 2016, a jury found defendant guilty of three counts of taking indecent liberties with a child, one count of statutory sexual offense of a person thirteen, fourteen, or fifteen years old, and one count of statutory rape of a person thirteen, fourteen, or fifteen years old. The jury acquitted defendant of one count of statutory rape.
 

 Judgment was arrested as to the indecent liberties convictions. Defendant was sentenced to a term of 144 to 233 months for the statutory rape conviction and to a consecutive term of 144 to 233 months for the statutory sexual offense conviction.
 

 Defendant was ordered to register as a sex offender upon release from imprisonment. The trial court further ordered that the Department of Adult Correction shall perform a risk assessment of defendant and will determine the need for satellite-based monitoring ("SBM").
 

 Defendant gave oral notice of appeal in open court. Defendant also filed a petition for writ of certiorari to this Court, since the sex offender registration and SBM are civil in nature, and thus require written notice of appeal. N.C. R. App. P. 3(a) (2017);
 
 State v. Brooks
 
 ,
 
 204 N.C. App. 193
 
 , 195,
 
 693 S.E.2d 204
 
 , 206 (2010). Our Court granted defendant's petition for writ of certiorari on 21 July 2017 and we review the merits of his appeal.
 

 II.
 
 Discussion
 

 On appeal, defendant argues that: (A) the trial court erred by permitting the State to introduce unreliable expert testimony, in violation of Rule 702 of the North Carolina Rules of Evidence ; (B) he received ineffective assistance of counsel where his attorney elicited evidence of guilt that the State had not introduced; (C) the trial court erred by failing
 
 *610
 

 *425
 
 to declare a mistrial
 
 sua sponte
 
 after a State's witness engaged in a "pattern of abusive and prejudicial behavior" during defendant's trial; and (D) the trial court impermissibly expressed an opinion on the evidence by denying defendant's motion to dismiss in the presence of the jury, in violation of N.C. Gen. Stat. § 15A-1222. We address each argument in turn.
 

 A.
 
 Expert Testimony Under Rule 702
 

 Defendant argues the trial court abused its discretion by allowing expert witness Wood to testify that it is not uncommon for children to delay the disclosure of sexual abuse and by allowing Wood to provide possible reasons for delayed disclosures. Specifically, defendant contends that Wood's testimony was unreliable because it was neither "based upon sufficient facts or data[,]" nor "the product of reliable principles and methods[,]" in violation of N.C. Gen. Stat. § 8C-1, Rule 702(a)(1)-(2). While acknowledging that our Court has previously allowed analogous expert testimony,
 
 see
 

 State v.
 

 Carpenter
 
 ,
 
 147 N.C. App. 386
 
 ,
 
 556 S.E.2d 316
 
 (2001),
 
 appeal dismissed and disc. review denied
 
 ,
 
 355 N.C. 217
 
 ,
 
 560 S.E.2d 143
 
 ,
 
 cert. denied
 
 ,
 
 536 U.S. 967
 
 ,
 
 122 S.Ct. 2680
 
 ,
 
 153 L.Ed. 2d 851
 
 (2002), he urges our Court to examine this issue in light of the General Assembly's 2011 amendment to Rule 702 of the North Carolina Rules of Evidence and the specific facts of his case.
 

 Our Court reviews a trial court's admission of expert testimony pursuant to N.C. Gen. Stat. § 8C-1, Rule 702(a) for an abuse of discretion.
 
 State v. Hunt
 
 , --- N.C. App. ----, ----,
 
 790 S.E.2d 874
 
 , 881,
 
 disc. review denied
 
 ,
 
 369 N.C. 197
 
 ,
 
 795 S.E.2d 206
 
 (2016). "A trial court may be reversed for abuse of discretion only upon a showing that its ruling was manifestly unsupported by reason and could not have been the result of a reasoned decision."
 
 State v. Riddick
 
 ,
 
 315 N.C. 749
 
 , 756,
 
 340 S.E.2d 55
 
 , 59 (1986).
 

 In
 
 State v. McGrady
 
 ,
 
 368 N.C. 880
 
 ,
 
 787 S.E.2d 1
 
 (2016), our Supreme Court confirmed that the most recent amendment of Rule 702 adopted the federal standard for the admission of expert witness testimony articulated in the
 
 Daubert v. Merrell Dow Pharmaceuticals, Inc.
 
 ,
 
 509 U.S. 579
 
 ,
 
 113 S.Ct. 2786
 
 ,
 
 125 L.Ed. 2d 469
 
 (1993), line of cases.
 
 See
 

 McGrady
 
 ,
 
 368 N.C. at 884
 
 ,
 
 787 S.E.2d at 5
 
 . "By adopting virtually the same language from the federal rule into the North Carolina rule, the General Assembly thus adopted the meaning of the federal rule as well."
 
 Id.
 
 at 888,
 
 787 S.E.2d at 7-8
 
 . Although Rule 702 was amended, our Supreme Court reasoned that "[o]ur previous cases are still good law if they do not conflict with the
 
 Daubert
 
 standard."
 
 Id.
 
 at 888,
 
 787 S.E.2d at 8
 
 . While the amendment "did not change the basic structure of the inquiry" under Rule 702(a),
 
 *426
 
 it "did change the level of rigor that our courts must use to scrutinize expert testimony before admitting it."
 
 Id.
 
 at 892,
 
 787 S.E.2d at 10
 
 . "To determine the proper application of North Carolina's Rule 702(a), then, we must look to the text of the rule, [the
 
 Daubert
 
 line of cases], and also to our existing precedents, as long as those precedents do not conflict with the rule's amended text or with
 
 Daubert
 
 ,
 
 [General Elec. Co. v. ] Joiner
 
 , [
 
 522 U.S. 136
 
 ,
 
 118 S.Ct. 512
 
 ,
 
 139 L.Ed.2d 508
 
 (1997) ] or
 
 Kumho
 
 ."
 
 Id.
 
 at 888,
 
 787 S.E.2d at 8
 
 .
 

 The text of Rule 702, in pertinent part, provides:
 

 (a) If scientific, technical
 
 *611
 
 or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue, a witness qualified as an expert by knowledge, skill, experience, training, or education, may testify thereto in the form of an opinion, or otherwise, if all of the following apply:
 

 (1) The testimony is based upon sufficient facts or data.
 

 (2) The testimony is the product of reliable principles and methods.
 

 (3) The witness has applied the principles and methods reliably to the facts of the case.
 

 N.C. Gen. Stat. § 8C-1, Rule 702(a) (2016).
 

 The
 
 McGrady
 
 Court held that:
 

 Rule 702(a) has three main parts, and expert testimony must satisfy each to be admissible. First, the area of proposed testimony must be based on "scientific, technical or other specialized knowledge" that "will assist the trier of fact to understand the evidence or to determine a fact in issue." This is the relevance inquiry[.]
 

 ....
 

 Second, the witness must be "qualified as an expert by knowledge, skill, experience, training, or education." This portion of the rule focuses on the witness's competence to testify as an expert in the field of his or her proposed testimony.... Whatever the source of the witness's knowledge, the question remains the same: Does the witness have enough expertise to be in a better position than the trier of fact to have an opinion on the subject?
 

 *427
 
 ....
 

 Third, the testimony must meet the three-pronged reliability test that is new to the amended rule: (1) The testimony [must be] based upon sufficient facts or data. (2) The testimony [must be] the product of reliable principles and methods. (3) The witness [must have] applied the principles and methods reliably to the facts of the case. These three prongs together constitute the reliability inquiry discussed in
 
 Daubert,
 

 Joiner
 

 ,
 
 and
 
 Kumho
 
 . The primary focus of the inquiry is on the reliability of the witness's principles and methodology, not on the conclusions that they generate[.]
 

 McGrady
 
 ,
 
 368 N.C. at 889-90
 
 ,
 
 787 S.E.2d at 8-9
 
 (internal citations, footnote, and quotation marks omitted).
 

 In the present case, defendant does not dispute either Wood's qualifications or the relevance of her testimony. Defendant challenges the reliability of Wood's delayed disclosure testimony; whether her testimony met prongs (1) and (2) of the three-pronged reliability test.
 

 "The precise nature of the reliability inquiry will vary from case to case depending on the nature of the proposed testimony. In each case, the trial court has discretion in determining how to address the three prongs of the reliability test."
 
 Id.
 
 at 890,
 
 787 S.E.2d at 9
 
 . Regarding factors a trial court may consider in its determination of reliability, the
 
 McGrady
 
 Court explained as follows:
 

 In the context of scientific testimony,
 
 Daubert
 
 articulated five factors from a nonexhaustive list that can have a bearing on reliability: (1) "whether a theory or technique ... can be (and has been) tested"; (2) "whether the theory or technique has been subjected to peer review and publication"; (3) the theory or technique's "known or potential rate of error"; (4) "the existence and maintenance of standards controlling the technique's operation"; and (5) whether the theory or technique has achieved "general acceptance" in its field.
 
 Daubert
 
 ,
 
 509 U.S. at 593-94
 
 ,
 
 113 S.Ct. 2786
 
 . When a trial court considers testimony based on "technical or other specialized knowledge," N.C. R. Evid. 702(a), it should likewise focus on the reliability of that testimony,
 
 Kumho
 
 , 526 U.S. at 147-49,
 
 119 S.Ct. 1167
 
 . The trial court should consider the factors articulated in
 
 Daubert
 
 when "they are reasonable measures of the
 
 *428
 
 reliability of expert testimony."
 
 Id.
 
 at 152 [
 
 119 S.Ct. 1167
 
 ]. Those factors are part of a "flexible" inquiry,
 
 Daubert
 
 ,
 
 509 U.S. at 594
 
 ,
 
 113 S.Ct. 2786
 
 , so they do not form "a definitive checklist or test,"
 

 id.
 

 at 593
 
 ,
 
 113 S.Ct. 2786
 
 . And the trial court is free to consider other factors that may help assess reliability given "the nature of the issue, the expert's particular expertise, and the subject of his testimony."
 
 Kumho
 
 , 526 U.S. at 150,
 
 119 S.Ct. 1167
 
 .
 

 The federal courts have articulated additional reliability factors that may be helpful in certain cases, including:
 

 (1) Whether experts are proposing to testify about matters growing naturally and directly out of research they have conducted independent of the litigation, or whether they have developed their opinions expressly for purposes of testifying.
 

 (2) Whether the expert has unjustifiably extrapolated from an accepted premise to an unfounded conclusion.
 

 (3) Whether the expert has adequately accounted for obvious alternative explanations.
 

 (4) Whether the expert is being as careful as he would be in his regular professional
 
 *612
 
 work outside his paid litigation consulting.
 

 (5) Whether the field of expertise claimed by the expert is known to reach reliable results for the type of opinion the expert would give.
 

 Fed. R. Evid. 702 advisory committee's note to 2000 amendment (citations and quotation marks omitted). In some cases, one or more of the factors that we listed in
 
 Howerton
 
 may be useful as well.
 
 See
 

 Howerton
 
 , 358 N.C. at 460, 597 S.E.2d at 687 (listing four factors: use of established techniques, expert's professional background in the field, use of visual aids to help the jury evaluate the expert's opinions, and independent research conducted by the expert).
 

 Id.
 
 at 890-91,
 
 787 S.E.2d at 9-10
 
 .
 

 At trial, Wood testified that she had a bachelor's degree in sociology from Georgia State University and a master of social work from Clark Atlanta University. She had been a licensed clinical social worker for six
 
 *429
 
 years. Wood was working as forensic interviewer at Pat's Place Child Advocacy Center. Wood testified that a forensic interview is a structured conversation with a child, allowing the child to be able to communicate in their own words, about a personal experience or something they had witnessed. She explained that the purpose of a forensic interview is to "elicit those details, and those details are either to refute the allegations that something may have happened to a child or a child may have witnessed something, or to support those allegations." She had approximately eleven years of forensic interviewing experience and over 200 hours of training in the field of forensic interviews of children suspected of being maltreated. Wood testified that she had obtained research-based knowledge of sexually abused children by reading research studies concerning the suggestibility of children, best types of questions to ask, how children develop and understand questions, and the process by which children provide disclosures. She continued to update her research in order to ensure she was utilizing the best practices. Wood testified that over her eleven years of experience, she had interviewed over 1,200 children, with 90% of those interviews focusing on sexual abuse allegations. She had also been qualified as an expert in child sexual abuse in Georgia over twenty times and once in North Carolina.
 

 The State tendered Wood as an expert in the field of clinical social work, specializing in child sexual abuse and defendant objected. On
 
 voir dire
 
 , Wood testified that she had not conducted research in the delayed reporting of sexual assault cases by children, but had reviewed research on "delayed disclosures, reasons for delayed disclosures, as well as concerns that delayed disclosures could be false disclosures, and so I have reviewed on both sides of the concerns of delayed disclosures." When asked by defense counsel whether the claims of the research participants were determined to be true or false, Wood explained that the research she had reviewed were "already supposing that the participants are victims" and "they are just going by what the participants are saying." Wood testified that she was forming opinions based on her observations through the thousand-plus interviews she had conducted, as well as research she had reviewed. She estimated that she had read over twenty articles on delayed disclosures.
 

 Ultimately, the trial court allowed Wood to testify as an expert in clinical social work, specializing in child sexual abuse cases. However, the trial court prohibited any testimony as to why, if at all, H.M. delayed in reporting the alleged abuse. The trial court stated as follows:
 

 THE COURT: Based on [ ] Miss Wood's education, she's a licensed clinical social worker, and having done forensic
 
 *430
 
 interviews of at least, approximately, over 1,200 children, 90 percent of those were focused on sexual abuse allegations, the Court will allow her to testify as a licensed clinical social worker with a specialization in child-sexual-abuse cases. And-however, despite that, the state has already said that they're not going to try to elicit testimony, and the Court will prohibit any testimony as to why, if at all, [H.M.] delayed in reporting, if she did, in reporting any potential inappropriate behavior, but just in general what Miss Wood has observed from child
 
 *613
 
 abuse, I'm sorry, sexual abuse from persons in the past.
 

 I think, [defense counsel], almost the exact question in State v. Dew, and then the quote: R.O. says, however, the appellate courts in this jurisdiction have consistently allowed the admission of expert testimony, such as the witness in that case, which relies upon personal observations of professional experience rather than upon quantitative analysis.
 

 I think something like this would not be able to be, as you indicated, from empirical data or empirical testing, but I think that's going to go to the weight rather than to the admissibility so I'll deny the motion to the extent that she cannot testify as an expert, but I'll allow it to the extent that she cannot testify as to why anybody involved in this case may have delayed reporting any inappropriate behavior.
 

 Wood later testified, amid objections from defendant, to the following:
 

 [THE STATE:] In your experience and in your survey of the research, is it uncommon for a child to delay disclosure of sexual abuse?
 

 [WOOD:] No.
 

 ....
 

 [WOOD:] No, it's not.
 

 [THE STATE:] What are some of the reasons that a child, based on the research and experience, in general, may delay disclosure?
 

 ....
 

 *431
 
 [WOOD:] There are numerous reasons. Some of them are due to fear: Fear of not being believed, fear of what others are going to say about them, fear of what the disclosure will do to the family, will it break the family up, fear that something will happen to the alleged perpetrator, fear that something will happen to the victim, fear that something will happen to the other family members if there's retaliation. Then, also, blame and self-guilt that they didn't do something to stop it, that they didn't run, that they didn't say something. Also, concern that if they tell, what will happen to their family. If this is-if the alleged perpetrator is a primary caregiver, will they have to begin to look for a new residence, will their brothers or sisters not be able to see their parent any further, and how will others in the family-will the other family members blame them for the destruction or the demise of the family; and so some of those are the reasons that children do not tell immediately.
 

 Wood further testified that she had personally heard children express the same potential reasons for delayed disclosures that she had found in her research throughout her experience in forensic interviewing.
 

 Defendant cross-examined Wood about whether the studies on delayed disclosures included false allegations of child sexual abuse. Wood replied that she had examined "both research that deal with children who have identified a positive disclosure and a negative disclosure, and they both do talk about delayed disclosures that is found in-throughout the research."
 

 First, to be reliable, an expert's testimony must be based upon sufficient facts or data pursuant to Rule 702(a)(1). Defendant contends that Wood's testimony was unreliable because she had not conducted her own research and instead, relied on studies conducted by others. Defendant is essentially arguing that the trial court abused its discretion when it admitted Wood's expert testimony which was based upon her review of research on delayed disclosures, combined with professional experience. Upon thorough review, we hold that this contention directly conflicts with the meaning of Rule 702, the
 
 Daubert
 
 line of cases, and our existing precedent.
 

 The Advisory Committee Notes to the federal rule state that subsection (a)(1) of Rule 702 "calls for a quantitative rather than qualitative analysis. The amendment requires that expert testimony be based on sufficient underlying 'facts or data.' The term 'data' is intended
 
 *432
 
 to encompass the reliable opinions of other experts." Fed. R. Evid. 702, Advisory Committee Notes on the 2000 Amendments;
 
 see
 

 Pope v. Bridge Broom, Inc.
 
 ,
 
 240 N.C. App. 365
 
 , 374,
 
 770 S.E.2d 702
 
 , 710 (citations omitted) (stating that the "requirement that expert opinions be supported by
 
 *614
 
 'sufficient facts or data' means 'that the expert considered sufficient data to employ the methodology[ ]' " and that "experts may rely on data and other information supplied by third parties"),
 
 disc. review denied
 
 ,
 
 368 N.C. 284
 
 ,
 
 775 S.E.2d 861
 
 (2015). Moreover, the Advisory Committee Notes provide as follows:
 

 Nothing in this amendment is intended to suggest that experience alone-or experience in conjunction with other knowledge, skill, training or education-may not provide a sufficient foundation for expert testimony.... In certain fields, experience is the predominant, if not sole, basis for a great deal of reliable expert testimony.
 

 Fed. R. Evid. 702, Advisory Committee Notes on the 2000 Amendments. The
 
 Daubert
 
 line of cases also stands for the proposition that "no one denies that an expert might draw a conclusion from a set of observations based on extensive and specialized experience."
 
 Kumho Tire Co. v. Carmichael
 
 ,
 
 526 U.S. 137
 
 , 156,
 
 119 S.Ct. 1167
 
 ,
 
 143 L.Ed. 2d 238
 
 , 255 (1999).
 

 The principle that experience alone or experience combined with knowledge and training is sufficient to establish a proper foundation for reliable expert testimony is in line with our previous holding in
 
 Carpenter
 
 . In
 
 Carpenter
 
 , our Court admitted analogous expert testimony under the prior version of Rule 702(a). The defendant in
 
 Carpenter
 
 argued that the trial court erred by admitting expert witness testimony from a licensed clinical social worker that "delayed and incomplete disclosures are not unusual in cases of child abuse[.]"
 
 Carpenter
 
 ,
 
 147 N.C. App. at 393
 
 ,
 
 556 S.E.2d at 321
 
 . The defendant asserted,
 
 inter alia
 
 , that the State had failed to establish that there was any scientific foundation for this opinion testimony and our Court rejected his argument.
 

 Id.
 

 Our Court reasoned as follows:
 

 Though she did not specifically cite supporting texts, articles, or data, [the expert witness] testified on
 
 voir dire
 
 that she was basing her conclusions on literature, journal articles, training, and her experience. Thus, a proper foundation was established for her opinion testimony. In her testimony, [the expert witness] explained general characteristics of children who have been abused. [The expert witness] testified that an abused child often delays
 
 *433
 
 disclosing the abuse and offered various reasons an abused child would continue to cooperate with an abuser. [The expert witness] did not testify as to her opinion with respect to [the victim's] credibility.
 

 Evidence similar to that offered by [the expert witness] has been held admissible to assist the jury.
 
 See
 

 State v. Bailey
 
 ,
 
 89 N.C. App. 212
 
 ,
 
 365 S.E.2d 651
 
 (1988) (finding expert testimony as to why a child would cooperate with adult who had been sexually abusing child admissible);
 
 State v. Richardson
 
 ,
 
 112 N.C. App. 58
 
 ,
 
 434 S.E.2d 657
 
 (1993),
 
 disc. review denied
 
 ,
 
 335 N.C. 563
 
 ,
 
 441 S.E.2d 132
 
 (1994) (concluding trial court did not err in admitting testimony describing general symptoms and characteristics of sexually abused children to explain the victim's behavior);
 
 State v. Bowman
 
 ,
 
 84 N.C. App. 238
 
 ,
 
 352 S.E.2d 437
 
 (1987) (holding trial court was proper in admitting a doctor's testimony that a delay between the occurrence of an incident of child sexual abuse and the child's revelation of the incident was the usual pattern of conduct for victims of child sexual abuse). Thus, for the foregoing reasons we hold that the trial court did not abuse its discretion in admitting [the expert witness'] testimony.
 

 Id.
 
 at 394,
 
 556 S.E.2d at 321-22
 
 .
 

 We find the circumstances in
 
 Carpenter
 
 and the case
 
 sub judice
 
 to be substantially similar. In
 
 Carpenter
 
 , our Court held that a proper foundation for the expert witness' testimony was established when the expert testified that her testimony was based on literature, journal articles, training, and experience. Likewise, Wood testified that her testimony on delayed disclosures was grounded in her 200 hours of training, eleven years of forensic interviewing experience, conducting over 1,200 forensic interviews with 90% of those focusing on sex abuse allegations, and reviewing over twenty articles on delayed disclosures. Wood, like the expert in
 
 Carpenter
 
 , testified about delayed disclosures in general terms and did not express an opinion as to the alleged victim's
 
 *615
 
 credibility. We hold that
 
 Carpenter
 
 is still good law as it does not conflict with the reliability requirements of the
 
 Daubert
 
 standard.
 
 See
 

 McGrady
 
 , 368 N.C. at 888,
 
 787 S.E.2d at 8
 
 .
 

 Based on the foregoing, Wood's testimony on delayed disclosures was clearly based upon facts or data sufficient to satisfy the first prong of Rule 702(a), and the trial court did not abuse its discretion in admitting this testimony.
 

 *434
 
 Second, an expert's testimony must be the product of reliable principles and methods pursuant to Rule 702(a)(2). Defendant argues that Wood's testimony is not reliable because the research she relied upon was flawed in the following ways: they assumed participants were honest; they did not have any methods or protocols in place to screen out participants who made false allegations; and because there was no indication of how many participants might have lied, it was impossible to know the "error rate." Defendant also argues that when Wood provided a list of possible reasons why an alleged victim might delay disclosure, she did not account for the obvious alternative explanation that the abuse did not occur.
 

 A careful review of the transcript establishes that these concerns were addressed throughout the examination and cross-examination of Wood and that Wood was able to provide detailed explanations for each.
 

 During cross-examination by defense counsel on whether the research she had reviewed eliminated delayed disclosures that were based on false allegations of child sexual abuse, Wood testified, "I've looked at both research that deal with children who have identified a positive disclosure and a negative disclosure, and they both do talk about delayed disclosures that is found in-throughout the research." As to defendant's argument that the research assumed participants were honest, Wood explained that the research on delayed disclosures was not focused on making a determination of whether the alleged sexual abuse had in fact occurred:
 

 [WOOD:] ... In the research they are-the researchers, from my understanding, at least the research that I have read, are not asking if it's true or false; they're taking from the-their methodology, they're asking, whether children or adults, to become participants if they have been victims, and so they're already supposing that the participants are victims.
 

 Regarding defendant's argument that there were no methods or protocols in place to screen out participants making false allegations and thus, no way to obtain an error rate, Wood explained that there was not an identifiable method to ascertaining whether the participants were in fact sexually abused:
 

 [DEFENSE COUNSEL:] Okay. So they're supposing that they're victims but it's not ascertained.
 

 [WOOD:] It's not. Based on the participants, the participants are saying-
 
 *435
 
 ....
 

 [DEFENSE COUNSEL:] Right. And so there's no digging down beneath the surface to see if those participants are being truthful about being abused.
 

 [WOOD:] You mean, like, are they making them take a lie detector test?
 

 [DEFENSE COUNSEL:] Or doing anything to find out if they're being truthful.
 

 [WOOD:] I don't know how else someone would find out the truth about child sexual abuse.
 

 [DEFENSE COUNSEL:] Exactly. So in these studies there's no way to know whether the participants who delayed reporting delayed reporting of a false occurrence or a true occurrence.
 

 [WOOD:] Well, I guess they are just going by what the participants are saying.
 

 Wood's clarification demonstrated that obtaining the "known or potential rate of error" was not pertinent in assessing reliability based on the nature of delayed disclosures.
 
 See
 

 McGrady
 
 , 368 N.C. at 890,
 
 787 S.E.2d at 9
 
 (stating that the "precise nature of the reliability inquiry will vary from case to case depending on the nature of the proposed testimony.").
 

 When asked by defense counsel if the research Wood reviewed involved a scientific data or theory, Wood suggested that if one method would be the creation of a control group, an ethical question would be raised in
 
 *616
 
 the context of delayed disclosures: "it would be unethical to have a control group to abuse children and uncontrol group to not abuse children." She further explained that: "I think that the theories that I have found is, is that they took populations that the researchers have gathered in their research; and according to multiple research articles, some of those same theories cross all the research, is similar."
 

 Lastly, in regards to defendant's argument that Wood did not account for alternative explanations of delayed disclosures, Wood's testimony reflected that she was identifying a non-exhaustive list of possible reasons:
 

 [THE STATE:] [ ] What are some of the reasons that a child, based on research and experience, in general, may delay disclosure?
 

 *436
 
 ....
 

 [WOOD:] There are
 
 numerous
 
 reasons.
 
 Some
 
 of them are due to fear.... Then, also, blame and self-guilt.... Also, concern that if they tell, what will happen to their family.... and so
 
 some
 
 of those are the reasons that children do not tell immediately.
 

 (emphasis added).
 

 In sum, defendant has failed to demonstrate that his arguments attacking the principles and methods of Wood's testimony were pertinent in assessing the reliability of Wood's testimony on delayed disclosures.
 
 See
 

 Kumho
 
 ,
 
 526 U.S. at 150
 
 ,
 
 119 S.Ct. 1167
 
 ,
 
 143 L.Ed. 2d at 251-52
 
 (stating that the
 
 Daubert
 
 factors "may or may not be pertinent in assessing reliability, depending on the nature of the issue, the expert's particular expertise, and the subject of his [or her] testimony."). Accordingly, we hold that Wood's testimony was the product of reliable principles and methods sufficient to satisfy the second prong of Rule 702(a), and the trial court did not abuse its discretion in admitting this testimony.
 

 B.
 
 Ineffective Assistance of Counsel
 

 In his second argument on appeal, defendant contends that he received ineffective assistance of counsel ("IAC") when his attorney elicited evidence of guilt that the State had not introduced. Specifically, defendant argues that while the State only elicited testimony from H.M. about one instance of sexual intercourse with defendant, defense counsel asked H.M. a leading question implying that she had sex with defendant on two occasions.
 

 Defendant directs us to the following exchange that occurred during defense counsel's cross-examination of H.M.:
 

 [DEFENSE COUNSEL:] So the first weekend that my client, according to you, inappropriately touched you and put his hands in your vagina and actually, you said, had sexual intercourse with you, you didn't tell your dad, did you?
 

 [H.M.:] No
 

 ....
 

 [DEFENSE COUNSEL:] So how many times are you saying that my client had actually put his penis inside of you, how many different nights?
 

 [H.M.:] Two times.
 

 *437
 
 In the present case, the record is not sufficiently complete to determine whether defendant's IAC claim has merit.
 
 See
 

 State v. Fair
 
 ,
 
 354 N.C. 131
 
 , 166,
 
 557 S.E.2d 500
 
 , 524 (2001) ("IAC claims brought on direct review will be decided on the merits when the cold record reveals that no further investigation is required...."). "Trial counsel's strategy and the reasons therefor are not readily apparent from the record, and more information must be developed to determine if defendant's claim satisfies the
 
 Strickland
 
 test."
 
 State v. Al-Bayyinah,
 

 359 N.C. 741
 
 , 753,
 
 616 S.E.2d 500
 
 , 509-10 (2005),
 
 cert. denied
 
 ,
 
 547 U.S. 1076
 
 ,
 
 126 S.Ct. 1784
 
 ,
 
 164 L.Ed. 2d 528
 
 (2006). Accordingly, the claim is premature and we are obligated to dismiss it "without prejudice to the defendant's right to assert [it] during a subsequent MAR proceeding."
 
 Fair,
 

 354 N.C. at 167
 
 ,
 
 557 S.E.2d at 525
 
 .
 

 C.
 
 Mistrial
 

 In his third argument, defendant contends that the trial court erred by failing to declare a mistrial
 
 sua sponte
 
 after H.M.'s father engaged in a "pattern of abusive and prejudicial behavior" during defendant's trial.
 

 Upon motion of a defendant or with his concurrence the judge may declare a mistrial
 
 *617
 
 at any time during the trial. The judge must declare a mistrial upon the defendant's motion if there occurs during the trial an error or legal defect in the proceedings, or conduct inside or outside the courtroom, resulting in substantial and irreparable prejudice to the defendant's case.
 

 N.C. Gen. Stat. § 15A-1061 (2015). "It is well settled that a motion for a mistrial and the determination of whether defendant's case has been irreparably and substantially prejudiced is within the trial court's sound discretion."
 
 State v. McNeill
 
 ,
 
 349 N.C. 634
 
 , 646,
 
 509 S.E.2d 415
 
 , 422-23 (1998) (citation omitted),
 
 cert. denied
 
 ,
 
 528 U.S. 838
 
 ,
 
 120 S.Ct. 102
 
 ,
 
 145 L.Ed. 2d 87
 
 (1999).
 

 In the present case, defendant points to several instances of conduct by H.M.'s father which he contends disrupted the "atmosphere of judicial calm" to which he was entitled. The first instance occurred in October 2015 at defendant's original court date which was later rescheduled. The trial court judge had just informed the audience to "maintain proper courtroom decorum at all times." Thereafter, defense counsel informed the trial court as follows:
 

 [DEFENSE COUNSEL:] Your Honor, related to that, I would ask the Court not just in the courtroom, but outside the courtroom. This morning the alleged victim's father in a very loud voice made some derogatory comments to me about my client.
 

 *438
 
 And since we're going to have jurors, prospective jurors in that hallway during the course of jury selection and the trial itself, I would ask the Court to instruct him not to do that in the hallway because jurors are everywhere in this courthouse.
 

 The trial court judge responded by stating:
 

 THE COURT: There is to be no contact; all right? And I expect that from everyone. Look, this is a-court's a place where trials are tried in the courtroom and not in the hallway. And I'm not going to have any type of intimidation by anybody take place, a witness, a party, the defendant, the victim. It's just not going to happen.
 

 And if it's reported to me that it does occur, you have been warned and I will deal with it appropriately; all right?
 

 The second instance occurred in April 2016, prior to the commencement of jury selection:
 

 [DEFENSE COUNSEL:] Your Honor, one more thing. This is a security matter for the courtroom staff. I've been informed by [defendant] and his girlfriend, they are both present in court today, both are inside the courtroom, that [H.M.'s father] approached my client and said something to the effect of-pardon my French-but f*** with my daughter, I'm going to f*** with you then he was on the phone standing close enough that his comments could be heard on the phone saying if [H.M.'s] mother was still alive, [defendant] would be dead, and, finally, that I'm going to kill the motherf***er. So we had some of these issues six months ago when we started this trial, and they're popping up again, and I'm very concerned about him sort of threatening when they got here. And the police may be made aware of this later when we finish with court, but I just wanted the Court and staff to know about the security concerns that I have with my client and others.
 

 THE COURT: I appreciate you making the courtroom and the court officers aware of that. All right.
 

 Defendant also points to several occasions during H.M.'s father's testimony where he was "admonished" by the trial court:
 

 *439
 
 THE COURT: If you know what [defense counsel is] asking, answer. If you don't, say you don't know.
 

 ....
 

 THE COURT: Listen to [defense counsel's] question.
 

 ....
 

 THE COURT: Sir, wait for the next question, please.
 

 ....
 

 [DEFENSE COUNSEL:] So going back to the morning that you discovered this on February 22
 
 nd
 
 , you speak to police at the scene of the karate studio, and then it's another couple weeks before Detective Bridges follows up and does anything?
 

 *618
 
 [H.M.'S FATHER:] Yeah. That's the good old Mecklenburg County court system, sir.
 

 THE COURT: Sir, if I have to keep admonishing you one more time-
 

 [H.M.'S FATHER:] I apologize.
 

 THE COURT: I'm going to-don't interrupt me.-about answering these questions directly, I'm going [to] exclude you from this trial and strike your testimony from the record, and you're going to be out in the hallway. Do you understand me?
 

 [H.M.'S FATHER:] Yes, sir.
 

 THE COURT: All right. Let's-I'm tired of this. Answer the lawyers' questions directly. Don't throw in editorial comments, don't threaten the lawyers or anybody else in this courtroom, and answer these questions, and let's move on with this. I'm sorry, [defense counsel.] Go ahead.
 

 The record demonstrates that in each of these instances, defendant did not request additional action by the trial court, defendant did not move for a mistrial, and defendant did not object to the trial court's method of handling the alleged misconduct in the courtroom. Accordingly, defendant has not preserved this argument for appellate review.
 
 See
 

 State v. McCall
 
 ,
 
 162 N.C. App. 64
 
 , 70,
 
 589 S.E.2d 896
 
 , 900 (2004) (holding that the defendant failed to preserve for appellate review a claim that the trial
 
 *440
 
 court erred by failing to declare a mistrial
 
 sua sponte
 
 after it had been notified that individuals were making hand signals to the alleged victim, where defense counsel did not request further action by the trial court, the transcript did not indicate who was making the hand signals or what type of signals were given, and the defendant did not move for a mistrial or object to the trial court's handling of the alleged disruption); N.C. R. App. P. 10(a)(1) (2017) ("In order to preserve an issue for appellate review, a party must have presented to the trial court a timely request, objection, or motion, stating the specific grounds for the ruling the party desired the court to make if the specific grounds were not apparent from the context.").
 

 D.
 
 Trial Court's Ruling in Presence of Jury
 

 In his final argument on appeal, defendant asserts that the trial court impermissibly expressed an opinion on the evidence by denying defendant's motion to dismiss in the presence of the jury, in violation of N.C. Gen. Stat. § 15A-1222. Specifically, defendant argues that because the trial court's ruling was audible to the jury, the exchange was a "focal point" of the jury's short trip to the courtroom, and the jury was not made aware of the difference in the standards of proof necessary to survive a motion to dismiss as compared to obtaining a conviction, the trial court's ruling carried a substantial risk of prejudice. We are not convinced by defendant's arguments.
 

 N.C. Gen. Stat. § 15A-1222 provides that "[t]he judge may not express during any stage of the trial, any opinion in the presence of the jury on any question of fact to be decided by the jury." N.C. Gen. Stat. § 15A-1222 (2015).
 

 We find the holding in
 
 State v. Welch
 
 ,
 
 65 N.C. App. 390
 
 ,
 
 308 S.E.2d 910
 
 (1983), to be controlling on this issue. The defendant in
 
 Welch
 
 argued that the trial court expressed an opinion, in violation of N.C. Gen. Stat. § 15A-1222, by summarily denying his motion to dismiss while in the presence of the jury.
 
 Id.
 
 at 393-94,
 
 308 S.E.2d at 912
 
 . Our Court stated as follows:
 

 The record, however, does not affirmatively disclose that the ruling was in fact audible to the jurors. Defendant did not seek to have the ruling made out of the presence of the jury, nor did he object or move for mistrial on this account at trial. Generally, ordinary rulings by the court in the course of trial do not amount to an impermissible expression of opinion.
 
 State v. Gooche
 
 ,
 
 58 N.C. App. 582
 
 , 586-87,
 
 294 S.E.2d 13
 
 , 15-16,
 
 modified on other grounds
 
 ,
 
 307 N.C. 253
 
 ,
 
 297 S.E.2d 599
 
 (1982). At most the ruling here
 
 *441
 
 merely informed the jury that the evidence was sufficient to allow it to decide the case. On this record no prejudice to defendant appears.
 

 Id.
 
 at 393-94,
 
 308 S.E.2d at 912-13
 
 .
 

 The circumstances found in
 
 Welch
 
 are analogous to those found in the present case.
 

 *619
 
 At the close of the State's evidence and outside the presence of the jury, defendant made a motion to dismiss the remaining charges. The trial court denied this motion. The next day, following the presentation of defendant's evidence, defendant renewed his motion to dismiss while the jury was present. Again, the trial court denied his motion. Defendant did not seek to have the ruling made outside the presence of the jury, he did not object, and he did not move for a mistrial on this account. Accordingly, we hold that defendant's argument is meritless.
 

 DISMISSED IN PART; NO ERROR IN PART.
 

 Judges ELMORE and DIETZ concur.
 

 [1]
 

 Initials are used throughout this opinion to protect the identity of the juvenile and for ease of reading.