An unpublished opinion of the North Carolina Court of Appeals does not constitute controlling legal authority. Citation is disfavored, but may be permitted in accordance with the provisions of Rule 30(e)(3) of the North Carolina Rules of Appellate Procedure.

IN THE COURT OF APPEALS OF NORTH CAROLINA

No. COA24-513

Filed 18 June 2025

Wake County, Nos. 20CRS002127-910, 20CRS215474-910, 20CRS215486-910, 21CR001359-910, 21CRS201282-910

STATE OF NORTH CAROLINA

v.

RICHARD KELTON, Defendant.

Appeal by defendant from judgment entered 17 May 2023 by Judge A. Graham Shirley in Wake County Superior Court. Heard in the Court of Appeals 22 May 2025.

*Attorney General Jeff Jackson, by Special Deputy Attorney General Sherri Horner Lawrence, for the State.*

*Cooley Law Office, by Craig M. Cooley, for defendant-appellant.*

FLOOD, Judge.

Defendant Richard Kelton appeals from the trial court's judgment finding him guilty of eight counts of statutory sexual offense with a child, and seven counts of taking indecent liberties with a child, and imposing on him sentences amounting to a term of life imprisonment. Defendant argues on appeal: first, the trial court plainly erred in allowing the State's expert witnesses to testify on delayed disclosure, as these

testimonies amounted to impermissible vouching; second, the trial court plainly erred in failing to issue a limiting instruction on the jury's consideration of the expert witnesses' "profile" testimonies; third, the trial court plainly erred in failing to issue a limiting jury instruction on consideration of the underage victims' forensic interviews as substantive evidence; and fourth, the trial court violated the Eighth Amendment of the United States and North Carolina Constitutions, by imposing an "unconstitutionally disproportionate" prison sentence. Upon review, we conclude Defendant has failed to demonstrate plain error on part of the trial court. Further, in our discretion, we decline to invoke Rule 2 to consider Defendant's constitutional contention, and dismiss this argument.

## I. **Factual and Procedural Background**

On 7 April 2007, E.K.[1] was born to her biological parents, Defendant and Meghan Kelton. Until she was in the fifth grade, E.K. lived with her parents and younger siblings, A.K. and J.K., at a house in the Kitts Creek subdivision of Morrisville, North Carolina. During the time she lived at the Kitts Creek house, E.K.'s friends from church—K.B., C.W., and J.P.—regularly spent the night with E.K., and as Meghan was a nurse who worked nightshifts, she would not be home during the sleepovers, leaving Defendant responsible for care of the children. When E.K. entered fifth grade, at which time she was around ten or eleven years of age,

---

[1] Pseudonyms are used to protect the identities of the minor children, all identified by initials, and as agreed upon by the parties and pursuant to N.C.R. App. P. 42(b).

she, her parents, and her siblings moved to a house in Holly Springs, North Carolina. M.K., who was a friend of J.K., would also regularly stay with E.K.'s family both during the time when they lived in Kitts Creek, and when they lived in Holly Springs.

While in fifth grade, E.K. began to routinely harm herself by cutting her wrists with an old razor she had found in her deceased grandmother's house. In sixth grade, E.K. confided in classmates that Defendant had "touched" her, as she thought "that every dad did that," but the classmates began to call her a "slut" for the remainder of the year, and E.K. did not tell anyone else about Defendant's behavior. Soon thereafter, E.K.'s parents discovered her self-harming behavior, and in January 2018, she began attending therapy sessions with a licensed clinical social worker, Michelle Chiarmonte.

E.K. continued to see Chiarmonte for the following two years, and on 9 July 2020, E.K. presented for therapy, curled up in a ball on the couch in Chiarmonte's office, and became nonresponsive. Chiarmonte observed this to be a "markedly physically different" presentation than was typical from E.K., which prompted Chiarmonte to ask E.K. whether Defendant had ever done anything to make her uncomfortable. E.K. nodded "yes[,]" so Chiarmonte asked E.K. what Defendant had done to her, and E.K. replied by making a "circular rubbing motion over her vaginal area[,]" and stating that it had occurred from "four to seven" when her "dad was asleep and [they] were cuddling." Following this therapy session, Chiarmonte disclosed to Meghan what E.K. had informed her, and diagnosed E.K. with post-

traumatic stress disorder. That same day, Meghan returned home and demanded Defendant leave the house; Defendant departed, and never saw E.K., nor lived in the family home, again.

Following E.K.'s disclosure, Chiarmonte reported the allegations of abuse to Child Protective Services. Soon thereafter, police opened an investigation into the matter, which ultimately revealed allegations of Defendant sexually abusing not only E.K., but also C.W., K.B., and M.K. On 13 July 2021, Defendant was charged by a bill of indictment with eight counts of statutory sexual offense with a child, and seven counts of taking indecent liberties with a child. On 8 May 2023, this matter came on for hearing before the trial court. During evidence, the State presented, without objection from Defendant, witness testimonies from E.K., K.B., C.W., and M.K. (the "juveniles").

E.K. testified that, when she was "very little"—both when she lived in Kitts Creek and Holly Springs—Defendant would regularly touch her with his fingers "on the outside" of her vagina "at least once a week[,]" and she detailed several specific instances of such violative conduct. E.K. also testified that, while Defendant would not put his fingers inside of her vagina as regularly as he would touch the outside, such digital penetration would occur "every few months or so[,]" and would often happen while she was lying on her parent's bed and Defendant pretended to be asleep. According to E.K., there were also incidents of Defendant touching her genitals while outside of their family house—such as during a church event, while on a trip to the

beach, and while on a trip to the Great Wolf Lodge in Williamsburg, Virginia—and Defendant's violations were not always limited to her genitals, as he once touched her chest while attempting to fix her swimsuit top.

C.W. testified that, on a night when she stayed at Defendant's house, Defendant touched her thigh under a blanket while pretending to be asleep; massaged her back on the bed in the master bedroom on more than one occasion; and walked in on her changing into her pajamas more than once. K.B. testified that, when she stayed at Defendant's house, Defendant put his hand on the outside of her "private parts" and digitally penetrated her vagina multiple times. M.K. testified that, when she stayed at Defendant's house, Defendant would often come into the room while she was changing her clothes, and that every time she left Defendant's house, her "privates would be hurting."

In addition to these testimonies, the State presented, in corroboration of the juveniles' testimonies and without objection, video footage of the juveniles' forensic interviews, all of which were conducted following the alleged abuse and prior to trial. The State also presented, without objection, expert witness testimonies from Chiarmonte; Samantha Dove, a therapist; Carolyn Grizer, a therapist; Scott Rodriguez, a forensic interviewer; Brenna Farley, a forensic interviewer; Dr. Lori Schweickert; and Dr. Elizabeth Witman.

*Michelle Chiarmonte's Expert Testimony*

Chiarmonte was properly tendered and accepted as an expert in the field of clinical social work. As to her qualifications, Chiarmonte stated that she was a sixteen-year psychotherapy veteran professional and the owner of Lumina Counseling Associates—a psychotherapy practice—and that she had twenty-five years of experience "working with families in either mental health and [sic] child protective service[s] capacity." Moreover, Chiarmonte: has a Bachelor's degree in social work from Calvin College, a Master of the Arts degree in clinical social work from the University of Chicago, and a clinical social work license for North Carolina and Georgia. She completed her continuing education through psychotherapy network—a premiere "conference of leading experts in the field of neuroscience, trauma, [and] psychopharmacology."

The State sought to admit Chiarmonte's testimony to discuss, in relevant part, delayed disclosure in child sexual abuse cases, and E.K.'s treatment. Regarding delayed disclosure, Chiarmonte stated that although she has not authored works on the subject, she has read instructive books and articles, and has worked with physically or sexually abused children who displayed indicia of delayed disclosure. Regarding victims who have experienced physical or sexual trauma, Chiarmonte testified:

> [O]ften, when trauma victims have to retell, and go back through in a very factual and linear way, the traumatic event or events associated with the event, it brings all of that feeling -- you know, that stored traumatic memory comes to surface as if the[y are] reliving it again.

Chiarmonte then elaborated on the concept of "stored traumatic memory," and in doing so, stated:

> [O]ur brain is divided into three parts. The front part is the thinking brain, the middle part is the limbic system which is the mammalian brain, and then the brain stem which is the reptilian brain. So typically, the frontal lobes, the thinking part of the brain, goes offline during traumatic events, which then prevents those memories from being stored in a linear timeline-type fashion.

Moreover, Chiarmonte testified that, when the "thinking part of the brain is offline," memory "goes into the limbic system which is really the middle brain or the mammalian brain."

Regarding E.K.'s treatment, Chiarmonte testified that: E.K.'s symptoms of abuse would be "cyclical," and that at different points in the treatment E.K. "would typically have another fragment resurface, and then she would talk about that in session"; E.K.'s "disclosures continued over the past, roughly, about a year and a half post-disclosure[,]" and this is not "uncommon" in children who have presented with concerns of sexual abuse; resurfacing of a "fragment" typically "happens on its own"; and, as to traumatized children recalling events, such recollection "on a timeline is extremely difficult, if not non-existent[.]"

### *Samantha Dove's Expert Testimony*

Dove, who served as M.K.'s mental health therapist at Foundation Restoration therapy, was properly tendered and accepted as an expert in licensed clinical social

work.  Dove testified as to delayed disclosure, her knowledge of which was based on her education, training, experience, and the relevant literature.  Dove stated that, generally, it is common for children not to disclose all details of prior sexual trauma, because:

> [A] lot of times they're actively trying not to remember what happened or not to think about it more specifically or talk about it, and so when it does come up, if just comes up in little bits and pieces that -- as they're able to handle it cognitively.

Although Dove was M.K.'s therapist, none of her testimony was specifically as to M.K.

### *Carolyn Grizer's Expert Testimony*

Grizer, who served as K.B.'s therapist with 180 Counseling, was properly tendered and accepted as an expert in licensed clinical social work.  Grizer's testimony was based on her educational training, licensure, and experience in social work and the relevant literature.  She testified as to the disclosure process for children who present with concerns of sexual abuse, stating that children who experience sexual abuse "never" disclose everything immediately.  Dove also testified as to her therapy experience with K.B., and that she initially asked K.B. questions in broad terms, and after the first six months of therapy, began to ask K.B. more specific questions.  According to Grizer, K.B. "didn't disclos[e] all of it at first, but she did disclose specific sleepovers, things that happened, . . . the Great Wolf Lodge incident[,]" and that Defendant digitally penetrated her.  Grizer stated that K.B. would have "instant tears" whenever the subject of sexual abuse arose, and that K.B.

disclosed she feared getting in trouble with Defendant, because she "never wants to get in trouble[.]"

*Scott Rodriguez's Expert Testimony*

Rodriguez, who conducted K.B.'s forensic interview in September 2021 at SAFEchild Advocacy Center, was properly tendered and accepted as an expert in diagnostic interviewing of children. Rodriguez's testimony was based on his training and experience, and as to delayed disclosure, he testified that, in his experience, children report and process trauma differently. When asked whether it is "common for children to tell everything all at once or is it a process[,]" Rodriquez replied:

> I think that's a 50/50 and all points in between because we look at disclosure as not an event; we look at it as a process. And people, in my experience, process things differently, and we have to process what we're willing to share, what we're not willing to share. And again, that's when those barriers come into place; the fear of repercussions or fear of the unknown, they tell certain things.

*Brenna Farley's Expert Testimony*

Farley, who performed forensic interviews of E.K. and M.K., was properly tendered and accepted as an expert in diagnostic interviewing of children. Farley's testimony was based on her training, experience, and the relevant literature, and she testified as to delayed disclosure. Farley specifically stated that delayed disclosure is "a very common phenomenon where children who have experienced abuse or maltreatment wait to report their experiences to other people[,]" and some relevant factors that may result in a child making a delayed disclosure are either physical or

emotional closeness to the alleged perpetrator, witnessing violence in the home, whether the child has a safe person to make a disclosure, the child's age, and fear.

*Dr. Lori Schweickert's Expert Testimony*

Dr. Schweickert, who served as E.K.'s psychiatrist, was properly tendered and accepted as an expert in psychiatry. Dr. Schweickert's testimony was based on her education, training, and experience. As to delayed disclosure, she testified that it is "basically the rule" and provided several reasons as to why a child may delay disclosure of sexual trauma, including that "children can't figure out what's going to happen to them if they tell[,]" and their memories of sexual abuse usually "come back in fragments."

*Dr. Elizabeth Witman's Expert Testimony*

Dr. Witman was properly tendered and accepted as an expert in child abuse pediatrics. Her testimony regarding delayed disclosure was based on her education, training, and experience as a child abuse pediatric specialist, and on the relevant literature. She testified that a child's feelings of fear, embarrassment, or shame often explain why a child may not initially disclose all experienced sexual abuse.

*Instruction, Conviction, and Sentencing*

Defendant put on no evidence, and following the close of evidence and closing arguments, the trial court provided its jury instructions, to which Defendant did not object. On 17 May 2023, the jury found Defendant guilty of all charges, and that same day, the trial court sentenced Defendant to: (1) six consecutive sentences of 300

to 420 months' imprisonment, (2) seven consecutive sentences of 16 to 29 months' imprisonment, and (3) two consecutive sentences of 300 to 420 months' imprisonment. Defendant timely appealed.

## II. **Jurisdiction**

Appeal to this Court lies of right from the final judgment of a superior court pursuant to N.C.G.S. §§ 7A-27(b) and 15A-1444(a) (2023).

## III. **Standard of Review**

As he concedes in his brief, Defendant failed to object to the trial court's alleged errors, and as such, has failed to preserve his arguments for our appellate review. *See* N.C.R. App. P. 10(a)(1) ("In order to preserve an issue for appellate review, a party must have presented to the trial court a timely request, objection, or motion, stating the specific grounds for the ruling the party desired the court to make[.]"). Regarding the trial court's alleged evidentiary and instructional errors, however, Defendant specifically and distinctly alleges plain error; as such, we review these issues for plain error. *See State v. Lawrence*, 365 N.C. 506, 516 (2012) ("To have an alleged error reviewed under the plain error standard, the defendant must 'specifically and distinctly' contend that the alleged error constitutes plain error." (citations omitted)).

For a defendant to demonstrate plain error, he must satisfy a three-factor test:

> First, the defendant must show that a fundamental error occurred at trial. Second, the defendant must show that the error had a probable impact on the outcome, meaning

that absent the error, the jury probably would have returned a different verdict. Finally, the defendant must show that the error is an exceptional case that warrants plain error review, typically by showing that the error seriously affects the fairness, integrity or public reputation of judicial proceedings.

*State v. Carwile*, 909 S.E.2d 913, 919 (N.C. 2024) (citation omitted); *see also Lawrence* 365 N.C. at 518 (providing that, to demonstrate plain error, "a defendant must establish prejudice—that, after examination of the entire record, the error had a probable impact on the jury's finding that the defendant was guilty" (citation and internal quotation marks omitted)).

## IV. <u>Analysis</u>

On appeal, Defendant argues: (A) the trial court plainly erred in allowing the State's expert witnesses to testify on delayed disclosure, as it constituted impermissible vouching; (B) the trial court plainly erred in failing to issue a limiting instruction on the jury's consideration of the expert witnesses' "profile" testimonies; (C) the trial court plainly erred in prohibiting jurors from considering the juveniles' forensic interviews as substantive evidence; and (D) the trial court violated the Eighth Amendment of the United States and North Carolina Constitutions, by imposing an "unconstitutionally disproportionate" prison sentence. We address each argument, in turn.

### A. Expert Testimonies on Delayed Disclosure

As Defendant concedes in his reply brief, he does not "raise a Rule 702 claim[,]" wherein he might generally challenge the admissibility of the State's expert witness testimonies, and instead raises only "an improper vouching claim" regarding the expert witnesses' testimonies on delayed disclosure. *See* N.C.R. Evid. 702 (governing the admissibility of expert witness testimony). Defendant specifically contends that, in testifying on delayed disclosure, the expert witnesses vouched for the veracity of the juveniles' accounts of Defendant's sexual assaults, and the trial court's admission of such testimony prejudiced his case. We disagree.

Under North Carolina law, expert testimony is admissible if "it will assist the trier of fact to understand the evidence or to determine a fact in issue[,]" *State v. Lawrence*, 352 N.C. 1, 17 (2000) (citation and internal quotation marks omitted), and "the opinion expressed is really one based on the special expertise of the experts, that is, whether the witness because of his expertise is in a better position to have an opinion on the subject than is the trier of fact[,]" *State v. Lane*, 365 N.C. 7, 27 (2011) (citation and internal quotation marks omitted). As this Court has provided, however, an "expert witness[] may not vouch for the credibility of victims in child sex abuse cases when there is no evidence of physical abuse[,]" and our "Supreme Court has found reversible error when experts have testified that the victim was believable, had no record of lying, and had never been untruthful." *State v. Betts*, 267 N.C. App. 272, 280 (2019) (citation and internal quotation marks omitted).

While an expert may not vouch for a juvenile victim's credibility, "[t]he fact that this evidence *may* support the credibility of the victim does not alone render it inadmissible. Most testimony, expert or otherwise, tends to support the credibility of some witness." *State v. Kennedy*, 320 N.C. 20, 32 (1987) (emphasis added). To this effect, "an expert witness may testify, upon a proper foundation, as to the profiles of sexually abused children and whether a particular complainant has symptoms or characteristics therewith." *State v. Stancil*, 355 N.C. 266, 267 (2002) (citations omitted). This Court has held that the proper foundation for an expert witness' testimony on delayed disclosure "was established when the expert testified that her testimony was based on literature, journal articles, training, and experience[,]" and the expert's testimony was properly admitted where the expert "testified about delayed disclosure in general terms and did not express an opinion as to the alleged victim's credibility." *State v. Shore*, 255 N.C. App. 420, 433 (2017).

Here, as set forth in the factual and procedural background section, above, each expert's testimony on delayed disclosure was based on a combination of education, training, experience, relevant literature, or licensure, meaning a proper foundation for the testimonies was established. *See Shore*, 255 N.C. App. at 433; *Stancil*, 355 N.C. at 267. Further, none of the experts testified as to the juveniles' credibility, and provided no opinion that the juveniles were believable, had no record of lying, or had never been untruthful. *See Betts*, 267 N.C. App. at 280; *Shore*, 255 N.C. App. at 433. Rather, each expert testified in general terms as to his or her knowledge of delayed

- 14 -

disclosure from child victims of sexual assault, and in the case of Chiarmonte and Grizer, testified as to symptoms and characteristics therewith, exhibited by E.K. and K.B., respectively. *See Stancil*, 355 N.C. at 267.

As such, per the above-delineated legal standards, the State's expert witness testimonies—which assisted the trier of fact to understand delayed disclosure—did not constitute improper vouching for the juveniles' credibility. *See Lane*, 365 N.C. at 27; *Lawrence*, 352 N.C. at 17. While the expert testimonies *may* have supported the juveniles' credibility, because most expert testimony "tends to support the credibility of some witness[,]" *see Kennedy*, 320 N.C. at 32, this, alone, does render inadmissible such testimony, and the trial court did not plainly err in admitting the State's expert witness testimonies,[2] *see Carwile*, 909 S.E.2d at 919.

## B. Limiting Jury Instruction on Expert "Profile" Testimonies

Defendant next contends that the trial court plainly erred in failing to issue a limiting instruction that the experts' "profile" testimonies may not be used for the substantive purpose of allowing the jury to infer, because the juveniles exhibited

---

[2] We note that Defendant also asserts in his first appellate argument that the concept of delayed disclosure has "little foundation in social science research[,]" there were inconsistencies between the expert testimonies on delayed disclosure, and Chiarmonte "had no qualifications to discuss memory[.]" Defendant's assertions, however, appear to be little more than extraneous musings made manifest in his brief, as Defendant cites no law in support of these assertions, and does not explain how these issues are germane to his assignment of error—namely, the trial court allowing improper vouching testimony to be admitted. As "it is not the role of this Court to create an appeal for an appellant or to supplement an appellant's brief with legal authority or arguments not contained therein[,]" we will not do so here, and any argument relevant to Defendant's assertions is deemed abandoned on appeal. *See Thomas v. Bass*, 261 N.C. App. 285, 282 (2018); *see also* N.C.R. App. P. 28(a).

certain characteristics, they must have been sexually abused by Defendant, and that such error was prejudicial to Defendant's case. We disagree.

As explained above, experts are permitted to testify as to the profiles of child sexual abuse victims. *See Stancil*, 355 N.C. at 267. This type of "profile" testimony "should be limited to its permissible uses, and if admitted, the trial court should generally provide a limiting instruction." *Betts*, 267 N.C. at 278 (citation and internal quotation marks omitted). Our courts have consistently held, however, that "[t]he admission of evidence which is competent for a restricted purpose without limiting instructions will not be held to be error in the absence of a request by the defendant for such limiting instructions." *Id.* at 278 (quoting *State v. Allen*, 141 N.C. App. 610, 616 (2000)). In *Betts*, where the defendant failed to request the trial court give a limiting instruction on expert "profile" testimony, we held there was no error, and therefore provided, "there can be no fundamental error that occurred at trial. Thus, by definition, there cannot be plain error." 267 N.C. App. at 279 (citation and internal quotation marks omitted).

Here, the State's expert witnesses testified as to the profile of sexually abused children, and specifically as to the characteristic therewith of delayed disclosure. *See id.* at 278; *Stancil*, 355 N.C. at 267. Defendant, however, neither objected to the State's introduction of these expert testimonies, nor requested the trial court provide a limiting instruction on the jury's consideration of these testimonies. Accordingly, in the absence of such a request by Defendant, "there can be no fundamental error

that occurred at trial[,]" and we find no plain error. *See Betts*, 267 N.C. at 279; *see also Carwile*, 909 S.E.2d at 919.

## C. Limiting Jury Instruction on Forensic Interviews

Defendant next contends the trial court plainly erred in failing to make a limiting jury instruction that the juveniles' forensic interviews may not be considered as substantive evidence of Defendant's guilt, and such error prejudiced Defendant's case. We disagree.

Like the standard for limiting jury instructions on expert witness testimony, set forth above, our Supreme Court has provided that "[w]hen a defendant does not specifically request an instruction restricting the use of evidence which corroborates the testimony of a witness, the admission of the evidence and the failure of the trial judge to give a limiting instruction is not error." *State v. Sauls*, 291 N.C. 253, 261 (1976); *see also State v. Cox*, 303 N.C. 75, 83 (1981) ("[W]hen a defendant fails to specifically request an instruction restricting the use of corroborative testimony, it is not error for the trial judge to admit the evidence without a limiting instruction.").

Here, Defendant failed to request a limiting jury instruction on consideration of the juveniles' forensic interviews—which were corroborative of their testimonies— and as such, Defendant has failed to establish a fundamental error occurred at trial. *See Sauls*, 291 N.C. at 261; *see also Betts*, 267 N.C. at 279. Accordingly, we find no plain error. *See Carwile*, 909 S.E.2d at 919.

## D. Unconstitutionally Disproportionate Sentencing

Defendant finally contends the trial court imposed on him an aggregate prison sentence disproportionate to his convictions under N.C.G.S. § 14-27.28 (2023), and as such, the sentence is unconstitutional under the Eighth Amendment of the United States and North Carolina Constitutions, but concedes he failed to preserve this matter for our appellate review. *See State v. Lloyd*, 354 N.C. 76, 86–87 (2001) ("Constitutional issues not raised and passed upon at trial will not be considered for the first time on appeal."). Defendant therefore requests this Court invoke Rule 2 of the North Carolina Rules of Appellate Procedure to consider the merits of his constitutional argument. As explained below, we decline to invoke Rule 2.

Under Rule 2, "[t]o prevent manifest injustice to a party . . . either court of the appellate division may . . . suspend or vary the requirements or provisions of any of these rules in a case pending before it . . . upon its own initiative[.]" N.C.R. App. P. 2. An appellate court's decision to invoke Rule 2 and suspend the appellate rules is always an exercise of discretion. *See State v. Bursell*, 372 N.C. 196, 201 (2019). Rule 2, however, "relates to the residual power of our appellate courts to consider, *in exceptional circumstances*, significant issues of importance in the public interest or to prevent injustice which appears manifest to the Court *and only in such instances*." *State v. Campbell*, 369 N.C. 599, 603 (2017) (citation omitted).

Here, nothing in the Record nor in either party's brief demonstrates "exceptional circumstances" sufficient to justify suspending or varying the appellate rules to consider the merits of Defendant's unpreserved constitutional argument. *See*

*id.* at 603. Accordingly, in our discretion, we decline to invoke Rule 2, and dismiss Defendant's argument.

## V. **Conclusion**

Upon review, we conclude Defendant has failed to demonstrate the trial court plainly erred in allowing the State's expert witnesses to testify on delayed disclosure, failing to issue limiting jury instructions on the expert witnesses' "profile" testimonies, and failing to issue limiting jury instructions on consideration of the juveniles' forensic interviews. Further, in our discretion, we decline to invoke Rule 2 to consider Defendant's constitutional contention, and dismiss this argument.

NO PLAIN ERROR In Part, and DISMISSED In Part.

Judges STADING and MURRY concur.

Report per Rule 30(e).